AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Apple Inc., One Apple Park Way, Cupertino, CA 95014 host of iCloud account jeatmon662@gmail.com

)
)
)
)
)
)

Case No.   '22  MJ2736

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute a Controlled Substance; |
| 21 U.S.C. §843(b) | Unlawful Use of a Communications Facility to Facilitate the Distribution of |
| 21 U.S.C. §846 | a Controlled Substance; Conspiracy to Distribute a Controlled Substance |

The application is based on these facts:

See attached Affidavit of US Postal Inspector Matt E. Carroll

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Matt E. Carroll, US Postal Inspector
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____Telephone_____ *(specify reliable electronic means).*

Date:   _____July 29, 2022_____

_____
*Judge's signature*

City and state:  San Diego, CA

Hon. Barbara L. Major, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A
## LOCATION TO BE SEARCHED

Apple, Inc. is an internet service provider with its primary computer information systems and other electronic communications and storage systems, records, and data located at Apple Inc., One Apple Park Way, Cupertino, CA 95014.

Apple hosts the following electronic communication accounts that are the subject of this search warrant and application: **jeatmon662@gmail.com** (the "**Subject Account**").

**ATTACHMENT B**
**ITEMS TO BE SEIZED**

## I.      Service of Warrant

The officer executing the warrant shall permit Apple, as custodian of the electronic files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.      Items To Be Provided by Apple

All subscriber and/or user information and content, including all SMS or text messages, iMessages, phone and FaceTime call logs, third-party application data, iCloud content and data, keybag and FileInfoList.txt files, and iCloud device backup data, electronic mail, images, videos, histories, VoIP logs, contacts or friend lists, profiles, method of payment, detailed billing records, access logs, backup data, transactional data, and any other files or records associated with the following account: **jeatmon662@gmail.com** (the "**Subject Account**").

## III.      Search and Items to Be Seized by the Government

The search of the data supplied by Apple pursuant to this warrant will be conducted by the US Postal Inspection Service as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of **period of January 1, 2020 up to and including July 15, 2021** and to the seizure of:

   a.   Communications, records, and attachments tending to discuss or establish the importation of or conspiracy to import controlled substances, or the distribution of or conspiracy to distribute controlled substances;

   b.   Logs, images, videos, application data, iCloud data, histories, contact or friend lists, profiles, payment and billing records, backup and transactional data, and any other communications, records, and attachments, tending to discuss or establish the importation of or conspiracy to import controlled substances, or the distribution of or conspiracy to distribute controlled substances;

   c.   Communications, records, and attachments tending to identify any co-conspirators involved in the activities in III(a) and (b) above; and

d.      Communications, records, and attachments that provide context to any communications described above, such as messages or electronic mail sent or received in temporal proximity to any relevant message or electronic mail and any message or electronic mail tending to identify users of the subject accounts;

which are evidence of violations of Title 21, United States Code, Sections 841(a), 843(b), and 846.

## **AFFIDAVIT FOR SEARCH WARRANT**

I, Matt Carroll, being duly sworn, hereby depose and state:

## **TRAINING AND EXPERIENCE**

1.      I am a Federal Agent employed as an inspector by the U.S. Postal Inspection Service ("USPIS").  I am an "investigative or law enforcement officer" of the United States within the meaning 18 U.S.C. 2510(7) and a federal law enforcement officer under Fed. R. Crim. P. 41(a)(2)(C). I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. 3061.

2.      I have been employed as a Postal Inspector since June 2012. From June 2012 through September 2012, I attended the Basic Postal Inspector Academy.  I am a member of the San Diego Contraband Interdiction and Investigations ("CI2") Team. Prior to this assignment, I was assigned to the US Postal Inspection Service's Mail Theft and Violent Crimes and the Mail Fraud and Money Laundering teams in San Francisco, California and the Mail Theft and Violent Crimes team in San Diego, California.  I have had formal training in controlled substance investigations, and have become familiar with the manner in which controlled substances are packaged, marketed, cultivated, manufactured and consumed. I also serve as an Anti-Money Laundering ("AML") program specialist for the USPIS which involves conducting investigations and providing expertise on money laundering and bank secrecy act enforcement.

3.      I also possess a Master's Degree in Accounting and an active Certified Public Accountant ("CPA") license in the State of Massachusetts. Additionally, I hold the private industry computer certifications CompTIA A+ and Security+ which cover computer/network repair and data/network security, respectively. Over the course of my employment, I have attended several training courses related to identity theft, drug cartels and narcotics trafficking, money laundering, bitcoin and cryptocurrency, the dark web, cellphone investigations and asset forfeiture.

4.      My current duties include investigating violations of the federal Controlled Substance Act and related offenses.  I have also had training regarding the investigation of

individuals who use the U.S. mail to transport controlled substances and proceeds from their sale, and who use Postal Money Orders to launder the proceeds.

### PURPOSE OF WARRANT

5.     The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, witness interviews, reviews of documents, and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a search warrant, it does not set forth every fact that I or others have learned during the course of this investigation.

6.     This affidavit supports an application for a warrant require Apple Inc. ("Apple") to disclose to the government records and other information, including the contents of communications, associated with Apple ID **jeatmon662@gmail.com** (hereinafter the "**Subject Account**") that is stored at premises owned, maintained, controlled, or operated by Apple, a company headquartered at One Apple Park Way, Cupertino, California 95014. The information to be disclosed by Apple and searched by the government is described in the following paragraphs and in Attachments A and B, which are attached hereto and incorporated herein.

7.     I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities, and evidence of violations of Title 21, United States Code, Sections 841(a)(l) (distribution and possession with intent to distribute a controlled substance), 843(b) (unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance), and 846 (conspiracy to distribute a controlled substance) (the "Target Offenses") are located in the **Subject Account**, and I seek authorization to search for and seize the information identified in Attachment B, incorporated herein, for the **period of January 1, 2020 up to and including July 15, 2021.**

8.     Based upon my experience and training, and all the facts and opinions set forth

in this Affidavit, I submit this Affidavit in support of the application to search the **Subject Account** for and to seize, as they pertain to violations of the Target Offenses:

    a. Communications, records, and attachments tending to discuss or establish the importation of or conspiracy to import controlled substances, or the distribution of or conspiracy to distribute controlled substances;

    b. Logs, images, videos, application data, iCloud data, histories, contact or friend lists, profiles, payment and billing records, backup and transactional data, and any other communications, records, and attachments, tending to discuss or establish the importation of or conspiracy to import controlled substances, or the distribution of or conspiracy to distribute controlled substances;

    c. Communications, records, and attachments tending to identify any co-conspirators involved in the activities described above; and

    d. Communications, records, and attachments that provide context to any communications described above, such as messages or electronic mail sent or received in temporal proximity to any relevant message or electronic mail and any message or electronic mail tending to identify users of the **Subject Account**;

as described in Attachments A and B, incorporated herein.

## **PROBABLE CAUSE**

### **Investigation Summary**

*Case Initiation*

9.    On May 18, 2020, I received a lead from USPIS analysts regarding the address PO Box 532614, San Diego, CA 92153 (hereinafter "Box 532614"). Box 532614 was believed to be receiving proceeds of controlled substance sales via the US Mail from the Tupelo, MS area.

10.    On May 19, 2020, I obtained a copy of the PS Form 1093 – *Application for Post Office Box Service*, for Box 532614. From that form, I learned that Box 532614 was opened on January 25, 2020 by Jamiron EATMON ("EATMON") who used the physical address of 2854 Evans Cir., Tupelo, MS 38801 and phone number of (619) 240-4405 to

open that box.

11.     On May 20, 2020, I searched law enforcement databases. Through my searches, I obtained a copy of EATMON's current Florida driver's license and his driver's license photograph.

12.     While using USPS databases, I identified several suspicious parcels mailed from the San Diego, CA area to several addresses in the Tupelo, MS area which had a direct association to parcels mailed to Box 532614, the box opened by EATMON, to include but not limited to, the following addresses:

2750 EVANS CIR, TUPELO, MS 38801

PO BOX 622, VERONA, MS 38879

389 COUNTY ROAD 125, HOULKA, MS 38850

*Seizure of 943 Counterfeit M30 Oxycodone Pills Containing Fentanyl*

13.     On May 27, 2020, I was alerted that Priority Mail parcel bearing tracking number 9505 5144 9587 0147 5147 41 addressed to "Darren Weatherspoon 2750 Evans Circle Tupelo, MS, 38801," with the return address of "Alicia Weatherspoon 1516 Hicks St Oceanside, CA, 92054" was mailed from Carlsbad, CA (within the Southern District of California) on May 26, 2021 (hereinafter "Subject Parcel 1"). On June 5, 2020, Subject Parcel 1 was sent to the USPIS San Diego Field Office for further investigation by USPIS personnel.

14.     On June 8, 2020, after inspecting the parcel, I determined that Subject Parcel 1 had various indicia raising suspicion, including, but not limited to, being heavily sealed and using excessive tape; a return address with a name that could not be associated with that address; and a recipient address that also could not be located with the name of the individual listed as the recipient among others. On that same day, a trained and certified narcotics detection dog and the dog's Border Patrol handler conducted an exterior examination of Subject Parcel 1 and the canine alerted to the presence of the odor of controlled substances on the parcel. On June 11, 2020, the Honorable Daniel E. Butcher authorized Southern District of California federal search warrant number 20MJ2263 for

Subject Parcel 1.

15.     On June 12, 2020, I searched Subject Parcel 1 pursuant to the warrant, and it was found to contain approximately 126.3 grams of suspected counterfeit M30 oxycodone pills. One pill was selected at random and was field tested using the TruNarc Handheld Narcotics Analyzer which field tested positive for acetaminophen. I know from my training and experience that legitimate M30 oxycodone pills do not contain acetaminophen as an active ingredient; thus, these pills appeared to be counterfeit M30 Oxycodone pills containing fentanyl which are commonly referred to on the street as "blues" or "roxys".

16.     A laboratory test was conducted by the US Postal Inspection Service's National Forensic Laboratory ("USPIS FLS") on the pills contained in Subject Parcel 1. USPIS FLS determined that 943 pills were contained inside Subject Parcel 1. One pill was selected at random by a USPIS FLS forensic chemist and was found to contain N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide ("fentanyl"), 4-anilino-N-phenethylpiperidine ("4-ANPP"), and acetaminophen. The net weight of the pills and fragments (excluding the analyzed pill) was $105.27 \pm 0.05$ grams. Fentanyl and 4-ANPP are Schedule II controlled substances.

17.     I have reviewed surveillance video of the mailing of Subject Parcel 1 from the Carlsbad Main Post Office. I have reviewed EATMON's Florida driver's license photograph, and, based upon my review of the surveillance video and the photograph of EATMON, as well as the other information detailed herein, I believe that EATMON was the individual who mailed Subject Parcel 1.

18.     On June 5, 2020 while using USPS databases, I learned that phone number (619) 240-4405 had called the USPS customer service hotline to inquire about Subject Parcel 1. This is the same phone number listed on the Post Office Box Application mentioned previously herein that was used by EATMON when he opened the box. A DEA administrative subpoena was served on AT&T for subscriber information associated to cellular phone number (619) 240-4405. AT&T responded to the subpoena, and I learned that cellular phone number (619) 240-4405 was assigned to the AT&T subscriber account

of "Jamiron Eatmon" with an email address of jeatmon662@gmail.com (the **Subject Account**).

*Seizure of 1.7 Kilograms of Methamphetamine*

19.     On November 4, 2020, I was alerted that Priority Mail parcel bearing tracking number 9505 5158 1253 0308 4648 33 addressed to "Tayanda Armstrong 389 County Road 125 Houlka, MS, 38850," with the return address of "Evan Brower 2007 Estrella Road Prescott, AZ, 86305" was mailed from Imperial Beach, CA (within the Southern District of California) on November 3, 2021 (hereinafter "Subject Parcel 2"). On or about the same date, I referred Subject Parcel 2 to Inspectors in Mississippi. On November 5, 2020, I was informed that Subject Parcel 2 had been intercepted by USPIS personnel.

20.     On November 10, 2020, after an inspector in Mississippi determined that the mailing address in Prescott, AZ did not who anyone by the surname of Brower living at that address and after a narcotics detector dog alerted to the exterior of the parcel, United States Magistrate Dave Sanders, in the Northern District of Mississippi, authorized a federal search warrant number in Case No. 1:20-MJ-35 for Subject Parcel 2. On or about the same date, Postal Inspector C. Tutor searched the parcel pursuant to the warrant, and it was found to contain approximately 4 pounds of a clear, crystalline substance that Inspector Tutor recognized, based on his training and experience, to be consistent with methamphetamine.

21.     A lab test was conducted by the USPIS FLS on the clear, crystalline substance contained in Subject Parcel 2. USPIS FLS determined that the clear, crystalline substance was found to contain d-methamphetamine hydrochloride with a 96 ± 3% purity and weighed 1,781.84 ± 0.10 grams. Methamphetamine is a Schedule II controlled substance.

22.     I have reviewed EATMON's Florida driver's license photograph and, based on my review of the surveillance video of the mailing of Subject Parcel 2 from the Imperial Beach Main Post Office. I believe that EATMON was the individual who mailed Subject Parcel 2.

*Seizure of 1,000 Counterfeit M30 Oxycodone Pills Containing Fentanyl*

23.     On or about November 20, 2020, Inspector Tutor informed me that he had intercepted Priority Mail parcel bearing tracking number 9505 5138 1726 0321 4157 10 addressed to "JEFFREY FLEMINGS PO BOX 622 VERONA, MS, 38879" with the return address of "BILL WILLIAMSON 2993 W LODGEPOLE LANE SHOW LOW, AZ, 85901" which was mailed from Chula Vista, CA (within the Southern District of California) on November 16, 2020 (hereinafter "Subject Parcel 3").

24.     On November 19, 2020, the Honorable Jane M. Virden authorized Northern District of Mississippi federal search warrant number 4:20-MJ-1016 for Subject Parcel 3. On that same day, after inspecting the parcel, the Postal Inspector determined that the package included a return address with a name that could not be associated with that address; and a recipient address that also could not be located with the name of the individual listed as the recipient. In addition, the return address on the package was "Show Low, AZ" which was determined to be eight hours from the mailing point in Chula Vista, CA. The Hon. Jane M. Virden signed the search warrant for Subject Parcel 3. On November 20, 2020, Postal Inspector C. Tutor searched the parcel pursuant to the warrant, and it was found to contain approximately 115.4 grams of suspected counterfeit M30 oxycodone pills. Inspector Tutor and agents from the Mississippi state police attempted to conduct a controlled delivery of Subject Parcel 3; however, the intended recipient never picked up the parcel.

25.     A laboratory test was conducted by the USPIS FLS on the pills contained in Subject Parcel 3. USPIS FLS determined that 1,000 pills were contained inside Subject Parcel 3. Two pills were selected at random by a USPIS FLS forensic chemist and were found to contain fentanyl, 4-ANPP, and acetaminophen. The net weight of the pills and fragments (excluding the analyzed pills) was $109.84 \pm 0.05$ grams. Fentanyl and 4-ANPP are Schedule II controlled substances.

26.     I have reviewed EATMON's Florida driver's license photograph, and based upon my review of the surveillance video of the mailing of Subject Parcel 3 from the Rancho Del Rey Post Office in Chula Vista, CA, I believe that EATMON was the

individual who mailed Subject Parcel 3.

***Seizure of $20,000 in US Currency***

27.     On March 23, 2021, I was alerted Priority Mail parcel bearing tracking number 9505 5100 1303 1081 4044 19 addressed to "Jamiron Eatmon PO Box # 532614 San Diego CA, 92153," with the return address of "Hazel Eatmon 3236 Shonda Circle Tupelo MS, 38801" was mailed from Tupelo, MS on March 22, 2021 (hereinafter "Subject Parcel 4).

28.     On March 26, 2021, I came in contact with Subject Parcel 4 at the Otay Mesa Postal Store, within the Southern District of California, and I detained it for further investigation. On March 29, 2021, I met with I met with United States Border Patrol Agent (BPA) Cary Parsoneault and her trained narcotic detection canine, "Falco" at the at the USPIS San Diego Field Office, within the Southern District of California. The canine team conducted an exterior examination of Subject Parcel 4. After the canine team examined Subject Parcel 4, BPA Parsoneault told me "Falco" alerted to the presence of the odor of controlled substances on Subject Parcel 4.

29.     On March 30, 2021, the Honorable Bernard G. Skomal authorized federal search warrant number 21MJ1175 for Subject Parcel 4. On March 31, 2021, I searched Subject Parcel 4 pursuant to the warrant and found it to contain $20,000 in US Currency in various denominations.

30.     On March 29, 2021 while using USPS databases, I learned that EATMON had contacted USPS customer service via email inquiring about the status of Subject Parcel 4. EATMON provided the contact phone number (619) 240-4405.

***Arrest of EATMON***

31.     On May 26, 2021, the Honorable Michael S. Berg authorized a three-count criminal complaint and arrest warrant for EATMON for violations of 21 USC 841(a)(1) – Possession with Intent to Distribute Methamphetamine and Fentanyl. On or about May 27, 2021, a Homeland Security Investigations ("HSI") agent entered EATMON into the Department of Homeland Security's ("DHS") Traveler Enforcement Compliance System

("TECS") with a request to detain and send EATMON to secondary inspection upon entry into the United States.

32.    On July 14, 2021 at approximately 4:10 PM, EATMON presented himself for admission into the United States at the San Ysidro Port of Entry primary vehicle lanes, within the Southern District of California, driving a Ford Mustang bearing California tag number 7FAF463. Based on a NCIC and TECS alert, EATMON was sent to secondary inspection. At approximately 5:15 PM, a Customs and Border Protection ("CBP") Officer contacted me and advised that EATMON had been sent to secondary inspection and detained at the San Ysidro Port of Entry based on the USPIS arrest warrant. CBP Officers searched EATMON's person and vehicle incident to EATMON's arrest and pursuant to the border search exemption. During the search, CBP Officers seized $27,194 US Currency in various denominations, two laptops, and an Apple iPhone X cellphone. On the same date, the US Currency, two laptops, and the cellphone were transferred to my custody, and I impounded them into evidence at the USPIS San Diego Field Office, within the Southern District of California.

33.    On January 6, 2022, the Honorable Michael S. Berg authorized federal search warrant number 22MJ0074 for EATMON's Apple iPhone. The cellphone was sent to the US Postal Inspection Service's San Francisco Digital Evidence Unit (DEU) where it was determined to be locked and encrypted. As of the date of this affidavit, the cellphone is still on a Greyshift GreyKey Forensic Access Tool to be unlocked. This process involves using a "brute-force" unlock whereby the GreyKey device tries each passcode until the passcode is guessed correctly, which is a very time-intensive process.

34.    On or about May 26, 2022, DEU conducted a Before First Unlock ("BFU") extraction of EATMON's iPhone. I know from my training and experience that nearly all data stored on the device cannot be obtained until the device is unlocked, in this case by a GreyKey. However, a BFU extraction can be conducted on certain Apple devices that have not been unlocked and unencrypted and small amounts of data such as some keychain items containing authentication credentials for email accounts and a number of authentication

tokens are available before first unlock. This small amount of data is needed to allow the device to start up correctly before the passcode is entered.

35.     I have reviewed the BFU extraction and learned that EATMON's iPhone was issued the cell phone number (619) 240-4405 and the Apple ID associated with the device is the **Subject Account**. Minimal other information was seized from the BFU extraction. As of writing this affidavit, EATMON's iPhone is still on a GreyKey.

36.     I know from my training and experience that iPhones, like the cellphone that was in EATMON's possession at the time of his arrest, can be backed up to an iCloud account which could reveal additional evidence of the Target Offenses.

## APPLE AND iCLOUD

37.     Apple is an Internet and electronics company that, among other things, provides electronic communication services to its subscribers. It is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system. Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps"). Apple's electronic mail service allows its subscribers to exchange electronic communications with others through the Internet. Apple's subscribers access Apple's services through the Internet. This and other information in this section is based in part on information published by Apply on its website.

38.     Subscribers to or customers of Apple use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Apple requires users to subscribe for a free Apple account, Apple does not verify the information provided by the subscriber for its free services.

39.     At the creation of an Apple account and for each subsequent access to the account, Apple logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the

Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Apple account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

40.     As described in further detail below, Apple's services include email, messaging, and file storage:

a.      Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.      iMessage and FaceTime allow users of Apple devices to communicate in real-time. iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct video calls.

c.      iCloud is a file hosting, storage, and sharing service provided by Apple. iCloud can be utilized through numerous iCloud-connected services and also can be used to store iOS device backups and data associated with third-party apps.

d.      iCloud-connected services allow users to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on icloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers.  iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations.  iCloud

Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

e.     Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

f.     Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

g.     Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System (GPS) networks, and Bluetooth, to determine a user's approximate location.

h.     App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

i.     Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services. A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

j.     An Apple ID takes the form of the full email address submitted by the user to create the account; it later can be changed. Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail). The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email

addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user. Apple accounts can also be identified by means of the International Mobile Equipment Identification (IMEI) number of the Apple phone.

k.     Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers. The user may also provide means of payment for products offered by Apple. The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

l.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services. For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website. Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account. Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

m.     Apple also maintains information about the devices associated with an Apple ID.  When a user activates or upgrades an iOS device, Apple captures and retains

13

the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card. Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage. Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number. In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com. Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

n.     Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space. That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain). iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data. Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive. Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

41.     In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

42.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

43.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

44.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

45.     Other information connected to an Apple ID may lead to the discovery of additional evidence. For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. And emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

46.     Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

47.     Based upon my training and experience as a Federal Agent, and consultations with law enforcement officers experienced in narcotics investigations, and all the facts and opinions set forth in the affidavit, I know that drug traffickers use mobile telephones, text messages, computers, third party communication applications and social networking sites which can be accessed through mobile telephones to communicate with one another. DTO members use cellular telephones and the private messaging features commonly found on them to communicate clandestinely with other members of the organization, to conceal specific information about the organization from law enforcement, and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. DTO members also are known to use multiple social media platforms.

48.     Based on my training and experience, I also know that photographs and videos found on mobile telephones and the Subject Account can serve as circumstantial evidence of a perpetrator's guilt, insofar as, for example, the photographs or videos show the suspects wearing similar clothing to the clothing that they were wearing during the commission of a crime, or reveal, through location-tagging features, that an individual was

present for a particular crime or event.

49.    DTO members use cellular telephones and other electronic devices with internet access to notify or warn their accomplices of law enforcement activity to include the presence and posture of U.S. and foreign law enforcement agents. Individuals involved in drug distribution and importation use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the **Subject Account** will enable investigators to establish further evidence of drug distribution and importation and of co-conspirators.

### Procedures For Electronically Stored Information

50.    Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Apple are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Apple for the relevant accounts and then to analyze the contents of those accounts on the premises of Apple. The impact on Apple's business would be disruptive and severe.

51.    Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs, and any other content from the Apple account, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Apple, to protect the privacy of Apple subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, the US Postal Inspection Service seeks authorization to allow Apple to make a digital copy of the entire contents of the account(s) subject to seizure.  That copy will be provided to me or to any authorized federal agent. The copy will be imaged and the image will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

52.    Analyzing the data to be provided by Apple may require special technical

skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant.  Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database, and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.    36.    ISPs do not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

53.    Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Apple, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within **90 days of receipt of the data from the service provider**, absent further application to this Court.

54.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

55.    All forensic analysis of the imaged data will employ search protocols directed

exclusively to the identification and extraction of data within the scope of this warrant.

## GENUINE RISKS OF DESTRUCTION

56.    Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.  In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

## CONCLUSION

57.    Based on the facts set forth in this affidavit, I believe there is probable cause that evidence of a crime, contraband, fruits of a crime, proceeds of a crime, other items illegally possessed, instrumentalities, or property designed for use, intended for use, or used in committing a crime of violations of Title 21, United States Code, Sections 841(a)(l) (distribution and possession with intent to distribute a controlled substance), 843(b) (unlawful use of a communication facility (including the mails) to facilitate the distribution of a controlled substance), and 846 (conspiracy to distribute a controlled substance) are concealed in the locations identified in Attachment A.  Accordingly, I request the issuance of a search warrant authorizing the search of the locations described in Attachments A, as well as the seizure of items described in Attachment B.

//
//
//
//
//
//
//
//
//
//

1  58.    I declare under penalty and perjury the foregoing is true and correct to the best

2  of my knowledge and belief.

3

4

5  MATT CARROLL

6  United States Postal Inspector

7

8  Sworn and attested to under oath by telephone, in accordance with Federal Rule of
   Criminal Procedure 4.1 on July 29, 2022.

9

10

11

12  HONORABLE BARBARA L. MAJOR

13  United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28